DICKINSON v. NETHERLAND AMERICAN STEAM NAVIGATION CO.

(Circuit Court of Appeals, Second Circuit. June 30, 1910.)

No. 286.

SHIPPING (§ 81*)—NEGLIGENT MANAGEMENT OF VESSEL—CRUSHING COALING BARGE AGAINST PIER.

A coal barge was placed between a large steamship and a pier at ebb tide, which tended to keep the steamship away from the pier, and remained there until high tide. It was afterward found that her side next the pier was crushed in. The steamship was made fast to the pier by lines, and also breasted off by two booms which extended on an upward slant from the pier to her side. *Held*, on the evidence, that the injury to the barge was caused by her being squeezed between the steamship and the pier when the tide rose, due apparently to the elevation of the outer ends of the booms, which permitted the steamship to come closer to the pier, and that her owner whose employés so placed and left the barge was liable therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 344, 345; Dec. Dig. § 81;* Navigable Waters, Cent. Dig. § 98.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by G. E. Dickinson against the Netherland American Steam Navigation Company. Decree for respondent, and libelant appeals. Reversed.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, dismissing a libel brought to recover damages alleged to have been sustained by the coal barge

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

California through being crushed between the respondent's steamship Rotterdam and the pier at which she was lying.

Wheeler, Cortis & Haight (J. W. Griffin, of counsel), for appellant.

Wing, Putnam & Burlingham (James Forrester, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge.  The decision of the District Judge merely contains the statement that, "there is nothing in The Adelaide, as reported in 131 Fed. 1002, to change the view of the evidence expressed at the hearing;" but the record contains no statement of what that view was.  We have reached a different conclusion for the following reasons:

(1) The coal barge, which carried 500 tons of coal, was put by respondent's employés in between the steamship Rotterdam and the pier on the evening of June 26, 1908.  The steamer lay on the south side of the pier, and was made fast with lines, and was also breasted off with two booms.  The tide was then ebb, and its natural tendency was to keep the Rotterdam as far away from the piers as the lines would permit, and also to keep the barge close up against the steamer's side.  The coal foreman of respondent testified that there was then a foot and a half to two feet space between the inshore side of the barge and the pier.  Also that at that time the steamer was 26 feet out from the dock.

(2) The Government Tide Tables showed that it was low water at Governor's Island at 1:20 a. m. June 27th and high water at 7:23 a. m.  That morning (Saturday) the barge was moved to the north side of the pier, with some coal yet on board which on Tuesday she delivered to the Nieuw Amsterdam.

(3) The tide rises and falls at this pier from four to six feet depending on wind and other conditions.  The deck of the dock is about three feet above high water.  The breasting booms ran from the deck of the dock inside the string-piece to the side of the ship, one forward and one aft.  It does not appear whether or not there was greater breadth of beam on the ship elsewhere than at the points they touched.  The inshore ends of the breasting booms were securely fastened with chains around the string-piece so that they could not slip, but the fastening acted as a joint so that the outshore ends of the booms could rise and fall.

All of the above, except the Government Tide Tables is from respondent's evidence.  The same evidence leaves us somewhat in doubt as to the outshore ends of the booms.

(4) Answering the question where the booms touched the ship respondent's witness says:

"They hang down 20 or 30 feet from the deck down, and the same way up, maybe 30 feet up from the water line. * * * Not 30 feet—no; pretty near 20 feet—somewhat like that; according to the tide and the ship discharging."

"Q1. Does the position of the booms up against the ship's side vary with the tide? A. The booms—that end there—is still. (The record does not disclose which end he pointed to.) That can't move, that end.

"Q2. When the ship rises and falls with the tide, the end that is on the string-piece does that move? A. Only just raises up like that (indicating); that is made fast with a big chain. At high tide the boom slopes up from an elevation 3 feet above the water to an elevation of 20 feet. * * * Under any change of the tide the ship can't move; she might move ahead 2 or 3 feet, but that is all. * * * The crew attend to the lines of a ship lying along a pier as the tide changes."

The master of the barge testified to hearing a crushing sound about 3 a. m. which waked him up. He searched and found the barge squeezed up against the dock, and the next day found that she was leaking. Evidently for some reason the District Judge discredited his statement; so we may leave it out.

(5) Libelant gave testimony, which we see no reason at all to discredit, that upon examination by competent person shortly after June 27th the barge was found in a leaky condition with knees broken and fastenings started and the side shoved in for a distance of the length of the boat, as if she had been squeezed.

The respondent insists that libelant's claim is untenable; that he proved too much, because, if an enormous vessel like the Rotterdam were forced in toward the dock by the flood tide with the barge between, she would have crushed the latter like an egg shell. But we do not understand that any such contention is made by libelant, nor that it is suggested that the Rotterdam was left entirely free to move inwards. The booms concededly breasted her out, and the only question is whether as rigged there was play enough to allow her to come in far enough to squeeze the barge so as to inflict the injuries subsequently found. We find nothing incredible in the theory advanced. The evidence leaves it uncertain whether the outer end of the boom moved up or down as the ship rose and fell. The answer to Q2 would seem to indicate that was the fact, as it would be if the outer end were fastened in place on the ship's side so that it would not slip, but the fastening would act as a joint as it did at the inshore end. If thus rigged, it is manifest that the rise and fall of the ship with the tide would reduce or lengthen her distance from the pier. The answer to Q1 would seem to indicate that the outer ends of the booms were not made fast to the ship, that she slipped up and down over them as the tide rose and fell, while they did not move. If that be so, there must have been some rigging to keep them in place against her push under the influence of a flood tide since they angled up from 3 feet above to 20 feet above the water line. There is nothing to show what that rigging was, but it must be difficult to hold down the outer end of a 35-foot boom against upward thrust, when the only apparent anchorage of the downhaul guy is on a pile of the dock a few feet below the inshore pivot. It would seem that any such rigging would necessarily result in giving some little vertical play to the outshore end. Very little play was required to allow a movement of the Rotterdam towards the dock, after the tide turned, sufficient to absorb the small margin of "one and a half to two feet" which was all there was when the ebb tide operated to keep her off. We have then an injury to the barge of such a character as could result only from her being squeezed transversely, the conceded fact that she lay where the Rotterdam, with a very slight change of posi-

tion, would inevitably have squeezed her, and no satisfactory evidence that the steamer was so breasted out that such a slight change was not possible. Indeed, the evidence rather indicates that it was quite to be expected.

The decree is reversed, with costs, and instructions to enter a decree for libelant for such damages as may be shown, with costs.